United States Fidelity & Guaranty Company v. Bank of
Batesville.

Opinion delivered July 6, 1908.

1. Fidelity insurance—liability on bond.—The bond of a surety company obligating itself to make good to an employer "all pecuniary loss sustained by the employer of money, securities, or other personal property in the possession of the employee, or for the possession of which he is responsible by any act of fraud or dishonesty on the part of said employee, * * * amounting to larceny or embezzlement," does not cover every liability or claim which might accrue in favor of the employer against the employee, but is expressly restricted to such acts of fraud or dishonesty as amount to larceny or embezzlement. (Page 355.)

2. Same—forfeiture for breach of warranty.—Where, in the application for a policy insuring the fidelity of an employee, the employer represented and warranted that it would check up the employee's accounts three times a month, and failed to do so, such failure avoided the bond. (Page 358.)

Appeal from Independence Chancery Court; *George T. Humphries*, Chancellor; reversed.

STATEMENT BY THE COURT.

This suit was originally brought in the Independence Circuit Court by appellee against appellants to recover on a fidelity bond written by the United States Fidelity & Guaranty Company, hereinafter called "Guaranty Company," agreeing to indemnify the Bank of Batesville against loss by reason of any act of fraud or dishonesty amounting to larceny or embezzlement on the part of its employee, Matt. R. Smith.

The Fidelity & Deposit Company of Maryland was security upon the bond of said Guaranty Company given to the State as a condition of its admission to do business in this State, and was made a party defendant to the action.

The cause was transferred to equity on the motion of the defendants.

The guaranty bond on behalf of M. R. Smith to the Bank of Batesville was dated January 31, 1903, and expired January 30, 1904. On January 30, 1904, in consideration of twenty dollars paid to defendant Guaranty Company, the bond was renewed for a period beginning January 30, 1904, and ending January 30, 1905.

The bond contained the following among other provisions and obligations:

"Bond No. 286602.

"THE UNITED STATES FIDELITY AND GUARANTY COMPANY. ·

"Home Office, Baltimore, Md.

"Whereas, M. R. Smith, hereinafter called 'the employee', has been appointed to a position of time check buyer in the services of Bank of Batesville, Mountain Home, Arkansas, hereinafter called 'Employer' and has been required to furnish bond for his honesty in the performance of his duties in the said position.

"And, whereas, the employer has delivered to the United States Fidelity & Guaranty Company, a corporation of the State of Maryland, hereinafter called 'the company,' a statement in writing setting forth the nature and character of the office or position to which the employee has been elected or appointed, the nature and character of his duties and responsibilities and the safeguards and check to be used upon the employee in the discharge of the duties of said office or position, and other matters, which statement is made a part hereof.

"Now, therefore, in consideration of the sum of twenty ($20.00) dollars paid as a premium, for the period from January 31, 1903, to January 30, 1904, at 12 o'clock noon, and upon the faith of said statement as aforesaid by the employer, which the employer hereby warrants to be true, it is hereby agreed and declared that, subject to the provisions and conditions precedent to the right upon the part of the employer to recover under this bond, the company shall, within three months next after notice, accompanied by satisfactory proof of a loss as hereinafter mentioned, has been given to the company, make good and reimburse to the employer all and any pecuniary loss sustained by the employer of money, securities or other personal property in the possession of the employee, or for the possession of which he is responsible by any act of fraud or dishonesty on the part of said employee in the discharge of the duties of his office or position as set forth in said statement referred to, amounting to larceny or embezzlement, and which shall have been committed during the continuance of this bond, or any renewal thereof, and discovered during said continuance, or within six months thereafter, or within six months from the death or dismissal, or retirement of the employee from the service of the said employer.

"Provided, always, that said company shall not be liable, by virtue of this bond for any mere error of judgment, or injudicious exercise of discretion on the part of said employee, in and about all or any matters wherein he shall have been vested with discretion, either by instruction, or by rule and regulations of the said employer. It is expressly understood and agreed that the said company shall in no way be held liable to make good any loss that may accrue to the said employer by reason of any act or thing done, or left undone, by the said employee, in obedience to or in pursuance of any direction, instruction, or authorization conveyed to and received by him from said employer, or its duly authorized agent in its behalf; and it is expressly understood and agreed that the said company shall in no way be held liable hereunder to make good any loss by robbery, or otherwise, that the said employer may sustain, except by the direct act or connivance of the said employee.   *   *   *

"If the employer's written statement hereinbefore referred to shall be found in any respect untrue, this bond shall be void."

The complaint alleges that during the continuance of the employment and services of the said M. R. Smith as time check buyer, from the 31st day of January, 1903, to April 21, 1904, the plaintiff advanced to Smith various sums of money with which to buy time checks, amounting in all to $120,529.22. That Smith accounted for $116,185.22, and is short in his account by $4,344.00. An itemized statement of the account is exhibited with the complaint.

The defendants' answer was a general denial, and contained an averment that they were not liable on the bond, except for the pecuniary loss caused by the larceny or embezzlement of the employee, and that they were discharged from liability on the bond by reason of statements of the bank, on the faith of which the bond was issued, containing misrepresentations and promises unfulfilled that render the bond void.

The facts are as follows: During the years 1902, 1903 and 1904, what is generally known as the White River branch of the Iron Mountain railroad was in course of construction. J. H. Reynolds & Company had the general contract to construct the whole line. Under them were between twelve and seventeen subcontractors. It was the practice of these subcontractors to

give their laborers between the first and tenth of the month a time check, evidencing the amount of labor performed during the preceding month and the sum due therefor to the laborer. These time checks were not paid until the 25th of the month. Nearly all the laborers wanted their wages in cash before the 25th of the month, and it soon became the custom along the line of the railroad for various parties to buy these time checks at various rates of discount, and take an assignment of them from the laborers. In order to obtain this discount and to get most of the time checks, the plaintiff bank arranged with the contractors and the several subcontractors to buy them, and employed M. R. Smith as its agent for that purpose. His duty was to go among the laborers at the camps of the subcontractors and buy all the time checks that were offered for sale at a discount. The bank furnished him money for that purpose. Afterwards, in order that he might get all the time checks that were for sale, Smith, with the knowledge of the bank, arranged with the subcontractors to leave sufficient money with them to buy the time checks that were offered for sale at a discount. He would visit the camps at intervals, take up the time checks for the money he had left, and would forward the time checks with a statement of the same, and of his expenditures to the bank. This method was pursued until about the 1st day of August, 1903, when, with the knowledge of the bank, he arranged to deposit funds to the credit of the various subcontractors with whom he was dealing in the banks most accessible to their camps, and in paying for time checks the subcontractors would draw upon their respective accounts. Smith would settle with them at stated periods, and the time checks would be forwarded to the bank, or a statement of amounts expended for time checks would be sent to Reynolds, the principal contractor, who would give Smith a receipt for the same, and Smith would in turn forward the receipt to the plaintiff bank. On pay day. Reynolds would remit to the bank in settlement. This custom of sending in the receipts instead of the time checks commenced about the 1st of May, 1903. Smith was at first given a salary of $50 per month. This was afterwards increased to $60 and then to $65 per month. He was allowed a liberal expense account, which was usually sent in at the end of the month, and was not required to be itemized.

On March 24, 1904, Mr. Thomas, assistant cashier of the bank, went to Yellville, Ark., to see Smith for the purpose of checking his accounts. Smith was sick with small pox, and Thomas did not get to see him. Afterwards Thomas arranged a meeting with the subcontractors for the purpose of checking up Smith's accounts.

About the 5th of April, 1904, the bank notified Smith that a checking up of his accounts disclosed that he was short. Afterwards, when Smith became well, he tried to assist the bank in its checking up and to find out where the discrepancy in his accounts lay.

The above is a general statement of the plan adopted and used by the parties in the business of buying and discounting time checks. A large mass of testimony was taken showing the details of the work and the various accounts and transactions that were entered into on account of the business, which we do not deem necessary to abstract here. Other facts will be stated under their appropriate heading in the opinion.

The chancellor found that amounts aggregating $817.23 were drawn by Smith on his account as agent at the Bank of Yellville. That such appropriation was without the authority of the plaintiff bank; and that the same amounted in law to larceny and embezzlement of such funds. That various other sums were shown to have been spent by said Smith during the period of his employment and during the existence of the bond and the renewal thereof, which are not shown by direct evidence. That the aggregate amount of all the sums expended by Smith was $3,993.14. A decree was rendered accordingly, and judgment for said amount given plaintiff against the defendants.

The defendants have appealed.

*Rose, Hemingway, Cantrell & Loughborough,* for appellants.

1. The statement of the bank, on the faith of which the bond was issued, contains misrepresentations and promises unfulfilled that render the bond void. The statements in the application are warranties, some of conditions then existing, and others promissory. If the statements are untrue, or the promises not carried out, no recovery can be had. 79 Ark. 528; 125 Fed.

892; 186 U. S. 342; 183 U. S. 402; 137 Cal. 596; 103 Fed. 427; 116 Fed. 449; 99 Fed. 242; 1 Tenn. Ch. 265; 88 Pac. 451; 86 N. Y. Supp. 105.

2. The bond providing that it would be invalid if not signed by the employee, and, Smith not having signed it, no recovery can be had. 92 N. Y. 238; 169 Mo. 507; 100 N. W. 148; 97 N. E. 836; 99 Md. 423; 90 N. Y. Supp. 465; 37 Mich. 590; 2 Mo. App. 345; 7 Neb. 4; 45 Ind. 213; 27 Am. & Eng. Enc. of L. 439.

3. The bond was rendered void by a change in the employment of Smith without notice to or consent of the surety. This is not only the common-law rule, but it is expressly provided for in the bond.

4. Failure to give the surety company *immediate* notice of the shortage was a breach of a condition of the bond. 125 Fed. 89; 79 Ark. 523; 44 Ind. 460.

5. There is no proof that Smith is indebted to the bank for acts of fraud or dishonesty amounting to larceny or embezzlement. For definition of what is meant by larceny and embezzlement in this connection, see, 189 Pa. St. 596; 100 Fed. 559; 94 Fed. 732; 52 Pac. 264; 41 Ark. 479; 32 Pac. 930; 39 Atl. 471.

*Sam M. Casey* and *Jno. W. & Jos. M. Stayton,* for appellee. pellee.

1. The finding of the chancellor that the bank complied with the stipulations as to the services to be performed by it contained in the stipulation was correct. "Words and terms used in an agreement between individuals must be taken in their ordinary and popular acceptation, and not in their strict technical signification." 4 Ark. 175; 5 Ark. 106. According to the reasonableness and construction of the words: 3 Ark. 222; *Id.* 258. Courts attach more importance to the general purpose of a bond, as shown by its provisions as a whole, and the interests of the parties in the subject-matter, than to the precise form of the words. 64 Ark. 189; 93 N. W. 226; 212 Ill. 68. See, also, 2 Lea, (Tenn.) 393; 68 Md. 449; 136 Mass. 226. If the bond is reasonably susceptible of two constructions, that construction most favorable to the bank should be adopted. 170 U. S. 133; 183 U. S. 418; 73 Ark. 333; 74 Ark. 41; Frost's Law of Guar. Ins. 67; 80 Ark. 49; 72 Pac. 1032; 67 Pac. 989. Guaranty

companies are not favored sureties. The rule *strictissimi juris* does not apply. Frost's Law of Guar. Ins. 13, 20-27, 208. The insurer is to be held to his risk in the broadest sense that is required to indemnify the insured against loss by dishonesty which falls fairly within the employment of the person whose honesty is guarantied. The employer is bound to no watchfulness except that which he. has expressly contracted to use for the benefit of the insurer. Frost's Law of Guar. Ins. 196, 197. Further, on the question of warranty as to manner, time and method of checking risk's accounts: *Id.* ¶ 76, citing 99 Fed. 242; 80 Fed. 766; 34 Fed. 291; 89 Fed. 819. See, also, 38 S. E. 908; 80 Ark. 85.

2. Smith's signature to the bond under the facts in this case was immaterial. He signed the application, and it and the bond must be construed together. The only object the company had in requiring the bond to be signed by him was to secure his assent to the terms of the bond and to secure from him a contract of indemnity from loss suffered through him. This is fully provided for in the application. The bond is valid without his signature. 1 Martin's Ch. Dec. (Ark.) 243; 40 Pac. 312; 119 Ill. 579; 29 Kan. 452; 31 S. W. 481; 53 Me. 284; 14 Okla. 572; 32 Pa. Super. Ct. 200; 5 Lea (Tenn.), 536; 54 Tex. 254; 39 Pac. 446; 79 Wis. 641; 44 Pac. 297; 35 Pac. 958; 89 Hun, 44; 2 Hill, 584; 21 N. Y. 179; 112 Mass. 466; 10 Ohio, 445; 69 Miss. 529; 86 Mo. 181; Kirby's Digest, § 7930. Smith's signature to the bond was waived by the conduct of appellant in putting the bank appellee to the trouble and expense in furnishing its agent information as to the shortage after it had learned that he had not signed the bond. 67 Ark. 584; Frost's Law of Guar. Ins. 210.

3. There was no warranty or promise as to the manner in which Smith should perform his duties as time check buyer, nor any method outlined for the performance thereof, nor any measure fixing his responsibilities in such position. The bank therefore had the right to keep him in its service at such salary as it saw fit to allow; to permit him to discharge his duties as he had formerly done; to either deliver or send cash to him, or permit him to draw upon it and in such amounts as it saw fit to permit him to handle; and if this cash was furnished to him in a

regular way under the belief that he was properly expending it, s) long as he continued to give evidence to the bank that he was discharging the duty that he owed it, the company cannot complain either as to its manner of doing business, nor of the amounts it entrusted to him.   Brandt on Suretyship, 432; 19 Up. Can. 73; 56 Fed. 281; 110 Mass. 163; 80 Ark. 55; 68 Md. 449 136 Mass. 226; 2 Lea (Tenn.), 393.

4. The bank was under no obligation to give notice of a shortage upon a mere suspicion, but only after investigation and ascertainment of the fact. 170 U. S. 133; *Id.* 160; 83 Am. St. Rep. 692; 89 *Id.* 777; 93 *Id.* 514; 67 Pac. 989. The notice given in this case was within a reasonable time, and was immediate within the the meaning of the stipulation in the bond.   79 Ark. 523, opinion on rehearing; Words & Phrases, "Immediate Notice."

5. It is not required that the insured should directly show each item misappropriated, but it is only necessary to prove such a state of facts by the fair preponderance of the testimony as would lead one to believe the shortage occurred through fraud or dishonesty amounting to larceny or embezzlement.   Kirby's Digest, § 1821; 13 Ark. 168; 34 Ark. 698; 56 Ark. 518; Kirby's Digest, § § 1837, 1839, 1844; 46 Pac. 368; 54 Ark. 611; 51 Ark. 119; 204 Ill. 69; 3 Q. C. B. 25; 115 Ky. 863; 58 Ark. 98; 38 S. E. 790; 70 Ark. 478.

HART, J., (after stating the facts).   The bond sued on is one of indemnity. Among other recitals not material here, the agreement is that the surety shall "make good and reimburse to the employer all and any pecuniary loss sustained by the employer of money, securities or other personal property in the possession of the employee, or for the possession of which he is responsible, by any act of fraud or dishonesty on the part of said employee in the discharge of the duties of his office or position as as set forth in said statement referred to, amounting to larceny or embezzlement."

A subsequent provision of the bond requires the employer, upon the employee becoming guilty of an offense covered by the bond, to lay information before the proper officer, and to furnish every aid and assistance not pecuniary, capable of being rendered, in bringing the employee promptly to justice.

In construing the provisions of a similar bond in the case

of *Monongahela Coal Co.* v. *Fidelity & Deposit Co. of Maryland,* 36 C. C. A. 444, the court said:

"These provisions all relate to the obligations of the company. From them it appears that the liability of the company is restricted to claims based upon the larceny, embezzlement, or at least the dishonesty of the employee. The obligation of the company does not cover every liability or claim which might accrue in favor of the employer and against the employee. A loss by carelessness or inattention to business might be the foundation of a just claim against the employee by the employer, which would impose no liability on the company by the terms of its obligations in the bond. If, with the consent of the employer, express or implied from the course of dealings between it and the employee, the latter used or retained moneys, charging itself with them, it would be no obligation covered by the insurance on indemnity of the company. It follows, therefore, that the fact that the account between the employer and the employee shows an indebtedness from the latter to the former is not sufficient of itself to support a claim on the bond against the company. To recover in an action on the bond, defense being made, there must be an allegation of the breach of it, sustained by evidence."

This view is sustained by the following authorities: *Williams* v. *U. S. Fidelity & Guaranty Co.,* (Md.) 66 Atl. 495; *Guarantee Co.* v. *Mech. Savings Bank,* 40 C. C. A. 542; *Milwaukee Theater Co.* v. *Fidelity, etc., Co.,* 66 N. W. (Wis.), 361; *Reed* v. *Fidelity, etc., Co.,* (Pa.) 42 Atl. 294.

The difference between liability on a fidelity bond insuring an employer against loss through the fraud or dishonesty of an employee and one insuring against the fraud and dishonesty of such employee amounting to larceny or embezzlement is discussed and clearly pointed out in the case of *U. S. Fidelity & Guaranty Co.* v. *Egg Shippers Strawboard & Filler Co.,* 78 C. C. A. 345.

The evidence shows that, commencing in May, 1903, and continuing up to the time his employment was terminated in 1904, Smith drew on his account as agent in the Bank of Yellville checks in favor of various parties. The aggregate amount of these checks was $817.53. Smith attempts to account for

these amounts.  He accounts for about one-half of it as being used in the business of the company, and the remainder seems to have been used for his own personal expenses and for the purchase of some jewelry.  The record does not disclose that the rest of the money found to be due the bank by Smith has been accounted for in any way.  The bank contends that the fact of Smith drawing these checks on this account as agent at the Bank of Yellville is evidence of appropriation of its funds, amounting to larceny and embezzlement under the terms of the bond.  The plaintiff bank and the Bank of Yellville during this period exchanged statements according to the usual course of business.  A comparison of the monthly statement received by the plaintiff bank from the Bank of Yellville with that received from Smith at the end of the month would have disclosed what items, if any, Smith had drawn and not used in the business with which he was intrusted.

Smith made no attempt to conceal these amounts, or the fact that he drew on his agent's account in favor of the various persons.  A comparison of these checks or drafts with the time checks would have disclosed whether or not they were given in discounting the amounts to become due the laborers; for the time checks given the laborer contained his name and the amount due him on pay day.  A checking up with Smith of his expense account would have shown whether these checks were a part of it.  He was allowed to draw on his account as agent for his expense fund, and was not required to itemize it.

After Smith was notified by the bank that his account was short, he assisted in every way possible to discover the discrepancy in his accounts.  A part of it, amounting in the aggregate to over $1,000, was found.  Smith is not shown to have any money or to have made any investments.  True, there is some testimony to show that he was extravagant, but it must be remembered that he was allowed a liberal expense account, which was not confined to his actual expenses, and that the opportunity to spend money on a line of railroad not in operation and being constructed through a country containing only small towns, could not have been great.  There is some testimony that he gambled.  This he denies.  But in any event it is not shown that he gambled habitually, but only occasionally, and then with men who could

not afford to play for high stakes. The law presumes every man honest until the contrary is shown. We do not think the evidence establishes that the discrepancy arose from the fraud or dishonesty of Smith amounting to larceny or embezzlement. Under the course of business adopted by the parties, the accounts of the bank showing the amount of money drawn by Smith and the time checks received by the bank are not sufficient evidence that Smith appropriated the funds. The books of the plaintiff bank charged every thing to Smith. Nothing was charged to the principal contractor, to the subcontractors, or to the local banks, with whom Smith was permitted to deposit money for the use of the subcontractors in discounting time checks. If mistakes were made at any of the local banks or at any of the the subcontractors' camps, the plaintiff bank had no way to take this into account, but the mistakes would be carried into the account of Smith as a shortage. The plaintiff bank knew that Smith kept no set of books, and that if any time checks were lost or were miscarried in the mails there would be no way to account for them.

The appellant Guaranty Company contends that the statement of the bank on the faith of which the bond was issued contains misrepresentations and promises unfulfilled that render the bond void.

The representations and warranties made in the application for the bond are as follows:

"Q.  To whom and how frequently will he account for his handling of the funds and securities?

"A.  Once a month to the bank.

"Q.  What means will you use to ascertain whether his accounts are correct?

"A.  Check up his remittances.

"Q.  How frequently will they be examined?

"A.  About three times per month.

"Q.  By whom will they be examined?

"A.  Cashier of the bank.

"Q.  When were his accounts last examined?

"A.  This day, January 30, 1903.

"Q.  Were they reported correct?

"A.  Yes.

"Q. Is there now or has there been any shortage due by applicant?

"A. No.

"Q. Is he now in debt to you?

"A. No.

"Q. If so, state the amount and nature of· such indebtedness.

"Q. Have you ever sustained loss through the dishonesty of any one holding the position of applicant?

"A. No."

A contract to indemnify an employer against the dishonesty or default of employees is subject to the same rules of construction as apply to other insurance contracts.   19 Cyc. 517; *American Bonding Co.* v. *Morrow*, 80 Ark. 49.

The only attempt to comply with the terms of the bond in this regard was that whenever money was delivered to Smith for the purpose of buying time checks it was charged to his account, and when time checks or expense accounts were sent in by him his account was credited with these amounts. A balance was struck, and he was considered to have on hand the amount of that balance. No effort was made to ascertain if the money was actually on hand, nor to ascertain in whose possession it was. The plaintiff bank knew that Smith left money with the various subcontractors or deposited it with the local banks most accessible to them, to be used by them in discounting and buying up time checks. No inquiry was ever made nor report given of the amounts in the hands of the various subcontractors. Had this been done at stated inervals, the bank could have known in whose hands its money really was, and any mistake made by any of the numerous persons handling the money could have been promptly corrected, and no shortage would probably have resulted. The questions asked and the answers given in the application for the bond show that it was in the contemplation of the parties to adopt some system whereby the bank should know at frequent intervals the exact state of the accounts between it· and the employee, who was the principal in the bond. Evidently this result could not be accomplished unless the checking up meant not only the examination of the record of the amounts furnished Smith and the time checks remitted by him, but where

the money was put out in the hands of numerous persons, as was done in this case, it also required that the part of the duty of plaintiff bank in checking up the accounts of Smith and requiring of him an account of his handling of the funds once a month would be not only to ascertain the balance that should be on hand, but to find out in whose hands it actually was at the time.

Reversed and dismissed.

WOOD, J., not participating.