SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff,

v.

ARKANSAS LOAN & THRIFT CORPO-
RATION, an Arkansas corporation, Sav-
ings Guaranty Corporation, an Arkan-
sas corporation, United Loan & Invest-
ment Company, an Arkansas corpora-
tion, Ernest A. Bartlett, Hoyt Borum,
and Afton Borum, Defendants.

No. FS–68–C–9.

United States District Court
W. D. Arkansas,
Fort Smith Division.
March 13, 1969.

See also D.C., 294 F.Supp. 1233.

74

Robert F. Watson, Fort Worth, Tex., for S.E.C.

William B. Putman, Fayetteville, Ark., John H. Fitzhugh, Fort Smith, Ark., for the Receiver.

Sam Sexton, Jr., Fort Smith, Ark., for defendants.

## OPINION

JOHN E. MILLER, Senior District Judge.

This is another chapter in the tortuous transactions of Arkansas Loan & Thrift Corporation (AL&T) and its subsidiaries, United Loan and Investment Company (United) and Savings Guaranty Corporation (Savings), all incorporated under the laws of Arkansas.

On March 11, 1968, the plaintiff, Securities Exchange Commission (SEC), filed its complaint containing two counts, in which it alleged that the defendants "have engaged and are engaging in acts and practices which constitute and will constitute violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933, as amended, [15 U.S.C. 77e(a, c) and 77q(a)], the plaintiff, pursuant to Section 20(b) of the Securities Act of 1933, as amended [15 U.S.C. 77t(b)], brings this action to enjoin such acts and practices."

On March 13, 1968, after a hearing, the court issued a preliminary injunction in accordance with the prayer of the complaint, and on March 14, 1968, the court appointed the present Receiver, Mr. Lem C. Bryan, of Fort Smith, Arkansas.

The order of March 14, 1968, appointing the Receiver required that he execute and file a bond in the sum of $25,000 with sureties to be approved by the court; and that he have complete and exclusive control, possession and custody of all the assets of the corporations. In

paragraph (8) of the order it was provided:

"That the said receiver be and he hereby is authorized to institute, prosecute and defend, compromise, adjust, intervene in or become party to such actions or proceedings in state or federal courts as may in his opinion be necessary or proper for the protection, maintenance and preservation of the assets of the defendants or the carrying out of the terms of this order, and likewise to defend, compromise or adjust or otherwise dispose of any or all actions or proceedings instituted against him as receiver or against the defendants and also to appear in and conduct the defense of any suit or adjust or compromise any actions or proceedings now pending in any court by or against the defendants where such prosecution, defense or other disposition of such actions or proceedings will in the judgment of the said receiver be advisable or proper for the protection of the properties of the defendants."

The Receiver duly qualified and has at all times been diligent in the discharge of his duties.

On September 23, 1968, after a full and complete hearing upon petition of the individual defendants and the movants herein, the preliminary injunction was made permanent, and the Receiver was ordered to proceed in an orderly liquidation of the assets of the defendant corporations for the benefit of the bond investment certificate (thrift account) holders and other creditors, excluding creditors who are officers, directors or trustees of the defendant corporations and those affiliates of said officers, directors and trustees in which they have a beneficial interest.

A full and complete history of the transactions of the defendants complained of by the SEC appears in an opinion of this court filed January 22, 1969, 294 F.Supp. 1233, and only such facts as are necessary to an understanding of the issues now before the court will be set forth herein.

The issue now before the court arose as follows. On January 28, 1969, the Receiver filed his petition for authority to settle a claim made by him as Receiver against the Fireman's Fund Insurance Company, which had issued its Brokers Blanket Bond No. 5096213 on March 25, 1965, covering the employees of AL&T. In the course of negotiations it appeared that Fireman's had also issued its Broker Blanket Bond No. 5114495 covering the employees of Savings. In paragraph V of the petition it was alleged:

"That the receiver and his attorneys have been engaged in negotiations with representatives of Fireman's Fund Insurance Company, which has resulted in said insurance company's offering its coverage limit of $150,-000.00 to the receiver in full satisfaction of any and all claims which the receiver might have against Bonds No. 5096213 and 5114495; that the receiver and his attorneys are of the opinion that there is no claim which could be successfully pursued against the Savings Guaranty Corporation Bond No. 5114495, and that the receiver, having been offered and tendered the sum of $150,000.00, the coverage limit of the Arkansas Loan and Thrift Corporation Bond No. 5096213, is of the view that it would be to the best interest of the receivership and the depositors and creditors of Arkansas Loan and Thrift Corporation to accept said sum of $150,000.00 and execute and deliver to Fireman's Fund Insurance Company a complete release of any and all claims against both bonds."

In connection with the proposed settlement, Fireman's agreed to leave control of all salvage or subrogation claims in the hands of the Receiver and to accept 20 percent of any and all recovery on the claims listed in the Receiver's proofs of loss, after deducting collection costs, until such time as Fireman's has been repaid the sum of $150,000.00, the remaining 80 percent of any and all such recoveries to be retained by the Receiver.

The proofs of loss, amounting to $604,-255.29, were submitted on October 1, 1968.

Upon examination of the petition, the court on January 28, 1969, the date of filing the petition, entered an order granting the petition and authorizing the Receiver to accept from Fireman's the sum of $150,000 in full settlement of all claims against the bonds executed by Fireman's. In accordance with the order, the Receiver accepted the said sum of $150,000 and executed a release which the court approved.

On January 29, 1969, Joe Lee Anderson, E. M. Clem, Gaylord B. Roberson, Joe D. Jeryo, Nyle B. Oswalt, Ralph C. Ingram, Pete Wells, Paul A. Michler, Leslie D. Humphrey and Lawrence T. Davis filed their motion in which they alleged that they had no notice of the filing of the petition by the Receiver and that the proceedings approving the petition of the Receiver for authority to make the settlement were void or voidable because of the failure to afford the movants notice and opportunity to be heard. The movants further alleged that the court was in error in holding that the total liability of Fireman's was $150,000, and in support of such allegation the movants set forth the first sentence of Section 6 of the bond, which provided:

"Payment of loss under this Bond shall not reduce the liability of the Underwriter under this bond for other losses whenever sustained."

In paragraph 5 of their motion, the movants alleged that the bond executed by Fireman's was for the use and benefit of the depositors of AL&T and "that by the terms of the bond the limits of its liability is $150,000.00 for each separate loss and not $150,000.00 in toto."

The movants also stated:

"They respectfully move the court to set aside its ex parte order which order was granted without notice or hearing and set this cause for hearing at which time the insurance policy or the Broker's Blanket Bond may be examined, *the limits of its liability*

*accurately reflected, and the wisdom of the settlement made the subject of proper inquiry."* (Emphasis added.)

Upon the filing of the motion, the court on the next day, January 30, 1969, in order to give movants or other interested persons an opportunity to be heard, entered an order fixing February 4, 1969, as a date for a full and complete hearing. In the order the court stated:

"Upon a consideration of the motion, the court is of the opinion that a full and complete hearing on all questions arising from the action of the court hereinbefore referred to and the motion of * * * should be held."

On February 3, 1969, the court directed that Fireman's be notified of the date of the hearing.

On February 4, 1969, the Receiver filed his response objecting to the motion to set aside the order of the court which approved the settlement with Fireman's.

At the hearing the movants appeared in person and by their attorney, and the Receiver appeared in person and by his attorneys. Fireman's made no formal appearance but its attorney was present in the court room.

Each of the movants was a Director of AL&T at all times material herein except Lawrence T. Davis, who was Treasurer from July 1965 to the date the corporation was placed in receivership. Ernest A. Bartlett, Jr., Afton Borum and Hoyt Borum are not named movants, but they were added as movants by amendment at the hearing.

The proofs of loss submitted by the Receiver were before the court, and any interested party had an opportunity to examine the claims. At the hearing the movants introduced two witnesses: Ralph C. Ingram, one of the movants, and the Receiver, Mr. Bryan.

Mr. Ingram, manager and owner of Commercial Underwriters, Inc., an insurance agency of Fort Smith, Arkansas, sold the bond to AL&T, which was introduced as Exhibit 1. He also sold the bond executed June 22, 1967, to Savings Guaranty, but there is no contention that

there is any liability on the Savings bond. The witness further testified that he became a member of the Board of Directors of AL&T on July 1, 1965, and a Trustee of Savings from the date of its organization by AL&T. The witness, when asked by the court about the various claims of the Receiver, stated that he did not know of any loss through any dishonest, fraudulent or criminal acts of any of the employees of AL&T.

Mr. Bryan, the Receiver, testified in response to questions by the able attorney for the officers and directors that the claims were based upon various audit reports and depositions, with which the officers and directors were familiar, and the opinion of the Receiver and his attorneys, based upon such facts and the provisions of the insurance policy or the Brokers Blanket Bond was that the total liability for such losses was $150,000.

On February 17, 1969, the attorney representing Fireman's wrote the court a letter in which he stated:

"While Fireman's Fund Insurance Company did receive a copy of your order of January 30, 1969, advising that the hearing would be held, neither myself nor any other representative of Fireman's Fund participated in the hearing. Notwithstanding the fact that Fireman's Fund is interested in the outcome of the hearing, we did not participate since we are not a party to the action. By the same token, it is our understanding and our position that the proceedings which were held Friday the 14th and remain pending in your court, would in no way bind or obligate Fireman's Fund Insurance Company since we are not a party to the action. We merely made a payment under the bond pursuant to a settlement approved by the Receiver and yourself."

In paragraph 2 of the motion, movants alleged that no notice of a hearing upon the proposal to approve such settlement was given them, and that the failure to provide notice was contrary to Rule 5(a), Fed.R.Civ.P., and that the proceedings approving such settlement are void or voidable because of the failure to forward the movants notice, and thus afford them an opportunity to be heard on the petition of Receiver for authority to settle the claim.

At the conclusion of the hearing, the court took under consideration the issues and directed the attorneys to submit briefs in support of their respective contentions, which have been received and considered.

 In view of the facts and the proceedings had following the granting of the petition of the Receiver for authority to settle the claim, the court feels that the failure to give notice is immaterial since the movants have suffered no injury.

Rule 5(a), Fed.R.Civ.P., provides:

"(a) Service: When Required. Except as otherwise provided in these rules, every order required by its terms to be served, every pleading subsequent to the original complaint unless the court otherwise orders because of numerous defendants, every written motion other than one which may be heard ex parte, and every written notice, appearance, demand, offer of judgment, designation of record on appeal, and similar paper shall be served upon each of the parties. * * *"

Prior to its amendment in 1963, Rule 5(a) required service of pleadings and other papers only upon parties *affected thereby*. The general purpose of the 1963 amendment was to promote full exchange of information among all *parties*. 2 Moore's Federal Practice, § 5.-04[1]. It is, therefore, clear that all parties must receive notice of every written motion, except a written motion which may be heard *ex parte*. It is equally clear that none of the named movants are parties to the original suit brought by the SEC. In any event, the issue whether movants were entitled to notice and hearing prior to the court's order of January 28 was rendered moot by the full and complete hearing ordered by the court on January 30 and held on February 14, wherein the movants were represented by counsel.

Turning now to the merits of the contentions of movants, the inquiry before the court involves the course of business conduct which, as a matter of prudence, should be followed in the administration of the assets of the receivership estate. In Gordon v. Hartford Sterling Co., (1935) 319 Pa. 174, 179 A. 234, the court, at page 237, stated:

"The question for the receiver and the court to decide in cases of compromise is one of business conduct—whether such action is prudent in the administration of the assets of the estate. The decision calls for weighing and balancing a variety of considerations. It involves the probable validity of the claim, the apparent difficulties attending its enforcement through the courts, the collectibility of the judgment thereafter, the delay and expenses of the litigation to be incurred, and the amount involved in the compromise. These are all factual considerations, though some have a legal aspect."

The obvious primary considerations here are the probable validity of the claim against Fireman's Fund and the expense and delay necessarily involved in protracted litigation, keeping in mind that there are many other claims which must be pursued in behalf of AL&T. The collectibility of a judgment against Fireman's Fund is clearly not a factor.

The *actual* validity of the claim is, of course not at issue. Macdonald v. Aetna Indemnity Co., (1914) 88 Conn. 571, 92 A. 154. The court must only ascertain, in a general way, the probable or possible result of litigation of the claim against Fireman's Fund. The provisions of the Brokers Blanket Bond must, therefore, be discussed in some detail. Fireman's

Fund is not, however, a party to the present action, and the court's opinion as to the construction of the bond bears only on the prudence of the settlement negotiated by the Receiver.

The insurer, by the terms of the bond, agreed to indemnify AL&T against losses caused by (among other things) any dishonest act of any of its employees.[1] The opening paragraph of the bond provides:

"In consideration of an agreed premium, Fireman's Fund Insurance Company, * * * hereby undertakes and agrees to indemnify and hold harmless Arkansas Loan and Thrift Corporation, Van Buren, Arkansas, * * *, to an amount not exceeding $150,000.-00 from and against any losses sustained by the Insured subsequent to noon of the date hereof and while this bond is in force, * * *, and discovered by the Insured subsequent to noon of the date hereof, and prior to the expiration of twelve months after the termination of this bond as an entirety as provided in the first paragraph of Section 10 or in any other manner."

The insuring clause covering fidelity provides coverage of:

"(A) Any loss through any dishonest, fraudulent or criminal act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss of Property through any such act of any of the Employees."

Section 6 of the bond,[2] as amended by rider SR 5310b, provides:

"NON-REDUCTION OF LIABILITY

"Section 6. Payment of loss under this bond shall not reduce the liability

---

[1]. Employee and employees, as used in the bond, are defined as "one or more of the officers, clerks and other employees while employed by the Insured during the currency of this bond, and whereever located, and Guest Students pursuing their studies or duties in any of the Insured's offices."

[2]. The present subsection (c) was added by the Securities Rider, SR 5310b. In the

original Section 6, the present subsections (d) and (e) were (c) and (d) respectively. The Receiver, in his brief alleges that the Securities Rider was deleted on the day the bond became effective by rider H-BN 171 5M-6-57, a copy of which is attached to his brief. The deleting rider is not, however, a part of the record, and the court in its discussion of the bond, must treat the Securities Rider as being in effect at all times.

of the Underwriter under this bond for other losses whenever sustained: PROVIDED, however, that the total liability of the Underwriter under this bond on account of (a) any loss or losses caused by any one act of burglary, robbery or hold-up, or attempt thereat, in which no Employee is concerned or implicated, or (b) any loss or losses with respect to any one unintentional or negligent act or omission on the part of any person (whether one of the Employees or not) resulting in damage to or destruction or misplacement of Property, or (c) any loss or losses, in which no Employee is dishonestly implicated, which are covered by Insuring Clause (E) of this bond, and which result from any one act performed by the Insured, or (d) any loss or losses other than those specified in (a), (b) and (c) preceding, caused by acts or omissions of any person (whether one of the Employees or not) or acts or omissions in which such person is concerned or implicated, or (e) any loss or losses with respect to any one casualty or event, is limited to the sum above stated in the opening paragraph of this bond irrespective of the total amount of such loss or losses."

In their motion, the movants contend that " * * * by the terms of the Bond the limits of its liability is $150,000.00 *for each separate loss* and not $150,000.-00 in toto. * * * " (Emphasis added.) In contrast, the movants in their "trial brief" submitted prior to the hearing of February 14, stated:

"Clearly the nonreduction of liability clause when read with the insuring agreement indicated that the limit of liability in this bond is $150,000.00 as to coverage *on each employee,* or $150,-000.00 as to coverage with respect *to any one event* and not $150,000.00 in total." (Emphasis added.)

The movants' chief witness at the hearing, Ralph C. Ingram, stated on cross-examination that, in his opinion, coverage under the bond extended to every employee for every dishonest act, but that discovery terminated the bond as to the discovered employee. The movants' present contention, as reflected by their memorandum brief submitted at the court's request after the hearing of February 14, is that "The limit of liability provided by the bond is $150,000.00 for each covered officer or employee, or $150,000.00 for each casualty or event insured against, whichever may be the lesser." In other words, if, for example, employee A acted in collusion with employee B, causing a loss of $300,000 and then employee A acted in collusion with employee C in a separate event, causing another loss of $300,000 the total liability of the insurer would be $300,000 according to movants. As to the first casualty, caused by A and B, the fidelity insuring clause would appear to cover each employee in the amount of $150,000, or a total of $300,000, the full amount of the loss. However, subsection (e) of Section 6 limits the total liability of the insurer for each casualty or event to $150,000. As to the second casualty, caused by A and C, the liability of the insurer would also be $150,000 but for an additional reason. Apart from subsection (e), the first limitation contained in subsection (d) of Section 6 limits the liability of the insurer for losses due to the acts or omissions of any one person to $150,000. The bond was thus exhausted as to employee A after the payment of the loss attributable to the first event. According to movants, the fact that employee A acted in collusion with B and C in no way affects the liability of the insurer.

In contrast, the Receiver contends and the court agrees, that the total liability of the insurer in the above fact situation is limited to $150,000. It is the position of the Receiver that the second limitation contained in subsection (d) of Section 6 must be given effect and that it operates to limit the total liability of the insurer for losses due to acts in which any one person may be implicated to $150,000. The Receiver contends that the potential liability of the insurer rises above $150,000 only when a plurality of persons act in separate events without

collusion. The Receiver contends that one person, Ernest A. Bartlett, Jr., was in fact implicated in all losses herein involved, although he acted in collusion with others named in the proofs of loss.

In determining the question of the insurer's probable liability under the bond, the law of Arkansas applies, and certain rules of construction applicable to contracts of guaranty or bonds issued by insurance or surety companies are to be kept in mind: First, a contract to indemnify an employer against the dishonesty or default of employees is subject to the same rules of construction that apply to other insurance contracts. United States Fidelity & Guar. Co. v. Bank of Batesville, (1908) 87 Ark. 348, 112 S.W. 957. Second, an insurance contract is to be construed like any other contract, where there is no ambiguity in the language. National Life & Accident Ins. Co. v. Baker, (1962) 234 Ark. 670, 354 S.W.2d 1. In this respect, the law of Arkansas relative to the construction of insurance contracts differs in no respect from that almost universally applied. Jefferson Insurance Co. of Pine Bluff, Ark., v. Hirchert, (8 Cir. 1960) 281 F.2d 396. Third, the contract will, in the event of an ambiguity, generally be construed strongly against the company and liberally in favor of the insured or obligee. Morley v. McGuire, (1951) 219 Ark. 206, 242 S.W.2d 112; Trinity Universal Ins. Co. v. Willbanks, (1940) 201 Ark. 386, 114 S.W.2d 1092. The rule of strict construction does *not* mean that the courts may strain the construction of ordinary terms in the contract to create an otherwise nonexistent ambiguity. In Jefferson Insurance Co. of Pine Bluff, Ark., v. Hirchert, supra, the Court of Appeals for the Eighth Circuit, at page 400 of 281 F.2d stated:

"Mr. Justice Sutherland, in Bergholm v. Peoria Life Ins. Co., 284 U.S. 489, 492, 52 S.Ct. 230, 231, 76 L.Ed. 416, stated the rule as follows:

" '* * * It is true that where the terms of a policy are of doubtful meaning, that construction most favorable to the insured will be adopted. * * * This canon of construction is both reasonable and just, since the words of the policy are chosen by the insurance company; but it furnishes no warrant for avoiding hard consequences by importing into a contract an ambiguity which otherwise would not exist, or, under the guise of construction, by forcing from plain words unusual and unnatural meanings.

" 'Contracts of insurance, like other contracts, must be construed according to the terms which the parties have used, to be taken and understood, in the absence of ambiguity, in their plain, ordinary and popular sense. * * *' "

The narrow issue is whether the probable liability of the insurer under the bond for the aggregate of losses in which any one person is implicated is limited to $150,000. Section 6 is a standard clause which has been in use for a good many years, but has seldom been litigated. In Federal Savings & Loan Ins. Corp. v. Aetna Insurance Co., (N.D.Ill.1968) 279 F.Supp. 161, the court had before it a clause almost identical to Section 6, with the exception that subsection (c) (which is (d) in the instant clause) read "any loss" rather than "any loss or *losses*." The case involved multiple defalcations committed by a single bank officer. The plaintiff there contended that the deletion of the word "losses" by amendment indicated an intention that the policy limitation apply only to a particular loss and not to a plurality of losses, even though caused by the misconduct of the same officer. The court held that the surety's liability for a plurality of losses due to the acts of any one person was limited to the sum specified in the bond as the maximum recoverable for a single loss. At page 163 of 279 F.Supp. the court stated:

"The court concludes that the defendant's construction of the bond is the more plausible one, due to the fact that in the preceding subsections (a) and (b) the drafter of the bond speci-

fied the coverage as to 'any loss caused by *any one act*' and in subsection (c), here involved, he uses the terms 'any loss * * * caused by *acts* in which such person is concerned.' (Italics supplied). The court believes the word 'acts' in the plural was used advisedly, and it was the intent of the insurer to limit its liability as to any one officer to the specified amount."

The court in Federal Savings did not, of course, deal with the precise situation involved in the instant case. Here, one person allegedly acted in collusion with three others in separate events, causing a plurality of losses.

Humboldt Trust & S. Bank v. Fidelity & Cas. Co. of N.Y., (1963) 255 Iowa 524, 122 N.W.2d 358, also involved a nonreduction of liability clause apparently similar to Section 6. The insured there claimed the maximum sum available under the *forgery rider* to the bond for each of several forgeries committed by the same individual. The provisions of the rider are not reported. The court did not construe the nonreduction clause, but held the maximum sum recoverable under the rider applied to each forgery as the rider was expressly made subject to the nonreduction clause. The reasoning of the court is not apparent, but the holding is necessarily predicated upon giving effect to the first sentence of the nonreduction clause without applying the proviso that follows. The case is thus at odds with the position of the parties in the instant case and does not in any way discredit the contention of the Receiver.

State Savings Bank v. Hartford Accident & Indemnity Co. is an unreported case from the Court of Appeals of Tennessee, decided July 8, 1953, which construes a "reinstatement" clause also similar to Section 6. Two bank employees began stealing independently but combined their efforts after each discovered the defalcations of the other. Acting in collusion, the two committed a series of thefts over a period of almost fifteen years, resulting in a total loss greatly in excess of the face amount of the bond. Plaintiff claimed the full amount of the

bond for each employee, while defendant contended its liability was limited to a single payment of the full amount, as each employee was "concerned or implicated" in the acts of the other. The court held that the fidelity insuring clause (essentially the fidelity insuring clause here) was subject to the limitations contained in the proviso to the reinstatement clause and that, because each employee was implicated in the shortages of the other, the liability of the defendant was limited to a single payment of the full amount of the bond. The court emphasized that the adoption of plaintiff's construction of the bond would result in giving effect to the fidelity insuring clause by itself, rendering the reinstatement clause meaningless. The court, at page 7 of the opinion, stated:

"Under our interpretation this bond is not simply a bond for $30,000 irrespective of other parts of the contract; nor is it a schedule bond disguised in language. It is a bond for $30,000 aggregate no matter how the loss occurs, whether the employee acts alone or in collusion; but, under the provisions of Section 13 (the reinstatement clause), if a loss is discovered, either partial or total with respect to the limit of liability stated in Section 1 (the insuring clause), automatic reinstatement pro tanto occurs to protect the bank retroactively against losses existing but not yet discovered and subsequent losses which may occur despite losses already paid, *subject to the limitation of subsection (c) of Section 13, supra.*

"Under this interpretation of the entire contract there is no conflict between these parts of the contract and each part is allowed to function, whereas under the opposite view the first part of Section 13 would serve no purpose and the proviso in the latter part would be in conflict with Section 1." (Emphasis added.)

The reasoning of the Tennessee court is fully applicable to the instant case. The fidelity insuring

clause, construed by itself, clearly favors movants' contention. Simply stated, it purports to provide coverage of *any* loss through *any* dishonest act of *any* employee, whether committed alone or in collusion with others. However, it is basic that a contract must be considered in its entirety and not by isolated parts. Great American Indemnity Co. of N.Y. v. Saltzman, (8 Cir. 1954) 213 F.2d 743, cert. den. 348 U.S. 862, 75 S.Ct. 85, 99 L.Ed. 679. Every provision of the contract must be given effect, if possible. Shepherd v. Mutual Life Ins. Co. of N. Y., (8 Cir. 1933) 63 F.2d 578. Section 6 must be given meaning, and it clearly limits the fidelity insuring clause when the two are harmonized. The first sentence of Section 6 provides that, even though a loss is paid, the Underwriter remains liable for other losses existing but not yet discovered and subsequent losses which may occur, subject however, to limitations contained in the proviso that follows, in which there is no ambiguity. The specific limitations involved here are those contained in subsection (d). The court is in agreement with Federal Savings in its construction of the first limitation in the subsection. As a result of the language " * * * (d) any loss or losses other than those specified in (a), (b) and (c) preceding, caused by acts or omissions of any person * * * " the liability of the insurer for a plurality of losses due to the acts of any one person is limited to a single payment of the full amount of the bond.

It is clear that the concluding clause of subsection (d) " * * * or acts or omissions in which such person in concerned or implicated * * * " must also be given effect. Movants, in their brief, set forth each subsection of Section 6 and provide their interpretation of the meaning of each one. They contend that subsection (c) (which is subsection (d) by virtue of rider SR 5310b) "means that any series of losses caused by the acts or omissions of any one person is limited to $150,000.00." Movants do not point out any ambiguity in the conclud-

ing clause of subsection (d); they simply ignore its existence. It will not go away, and it must be given its plain meaning when read with the remaining provisions of the contract. As a result of the language " * * * or acts or omissions in which such person is concerned or implicated * * * ", the liability of the insurer for a plurality of losses due to acts in which any one person is *implicated* is also limited to a single payment of the full amount of the bond. Stated differently, subsection (d) of Section 6 clearly provides that, regardless of the number and amount of losses in which any one person participates, either as the sole actor or in collusion with others, the maximum liability of the insurer for the aggregate of those losses is $150,000. The adoption of movants' contention would result in piecemeal construction, which is forbidden to the court, and would render the concluding clause of subsection (d) mere surplusage.

The movants also contend that (1) the sale of unregistered securities (bond investment certificates) is a criminal act which is covered under the bond; that (2) claims should have been made under either the Forgery or Securities[3] riders to the bond; that (3) the Receiver did not "recognize" the bond clause providing for the payment of court costs and attorneys' fees incurred and paid by the insured in defending certain suits; and (4) that the agreement entered into between the Receiver and Fireman's Fund as to the division of future recoveries is less favorable to AL&T than the insuring agreement.

The Receiver's conclusion as to the probable liability of the insurer under the bond and, in particular, the implication of Ernest A. Bartlett, Jr., in all of the losses herein involved, was based upon information contained in the depositions taken and the audit conducted in connection with the receivership, a record made by and available to the movants. Just as exceptants to an item charged to the account of a receiver bear

3. See fotenote 2, supra.

the burden of proof, Atlas Fence Co. v. West Ridgelawn Cemetery, (1948) 1 N.J. 110, 62 A.2d 212, movants here were obliged to allege *facts* showing the imprudence of the settlement. Movants, in their reply brief, state that "It may well be that an examination of the facts will disclose that the liability of the bonding company was less than $150,000, but we believe that it is a matter to be determined by evidence and that it is not presently before the court." The precise purpose of the hearing held by the court on February 14 was to elicit all information pertinent to movants' claims. If the movants were aware of any misconduct not set forth in the proofs of loss, they did not enlighten the court. The movants' chief witness, Ralph C. Ingram, stated on cross-examination that he had seen no evidence to indicate that there was any liability on the bond whatever. As heretofore stated, Ingram in reply to a question from the court, stated that he did not know of any loss through any dishonest, fraudulent, or criminal acts or any employee of AL&T. The only other witness called by the movants was the Receiver. If, in fact, there were dishonest, fraudulent or criminal acts committed by the employees of AL&T which resulted in losses, and if the acts were isolated and individual acts of such employees, it would not have been difficult for the directors and officers of AL&T to have testified and produced the facts necessary to remove all doubt. There must be some good reason why such testimony was not presented. The proofs of loss disclose the most probable reason why no explanation was made. The Receiver testified at the hearing that his investigation revealed no other claims against the bond. Moreover, it is doubtful that several of the casualties set forth in the proofs of loss would fall within the coverage afforded by the bond even if proven. For example, the Receiver claims a loss of $122,301.04 as a result of a payment of dividends by AL&T while the corporation was insolvent. While such procedure is certainly unsound, it is highly unlikely that it amounts to a dis-

honest, fraudulent, or criminal act within the fidelity insuring clause. In addition, the Receiver claims several losses from loans made to officers of AL&T and others as well as losses which appear to have resulted from trading. By virtue of Section 1(d), the bond expressly does not cover: "Any loss the result of any loan made by the Insured or by any of the Employees, whether authorized or unauthorized, except when covered under Insuring Clause (A)." Losses resulting directly or indirectly from trading are expressly excluded by Section 1(g). The insurer is thus presented with defenses too substantial to ignore.

The court is not called upon to decide whether the sale of unregistered securities is a criminal act within the meaning of the fidelity insuring clause, as there is absolutely no evidence that AL&T sustained any losses by reason of such sales, nor is there any evidence that AL&T sustained any loss from acts which would fall within the coverage of the Forgery and Securities riders. Moreover, both riders are expressly made subject to Section 6 of the bond.

The bond clause relating to court costs and attorneys' fees provides in part:

"The Underwriter will indemnify the Insured against court costs and reasonable attorneys' fees incurred and paid by the Insured in defending any suit or legal proceeding brought against the Insured to enforce the Insured's liability or alleged liability on account of any loss * * * which, if established, would constitute a valid and collectible loss sustained by the Insured under the terms of this bond. Such indemnity shall be in addition to the amount of this bond."

The movants make no specific allegation regarding the above clause, and the court is unaware of any suit against AL&T to enforce its liability for any loss which would constitute a collectible loss under the bond.

Finally, the agreement entered into between the Receiver and Fireman's Fund as to the division of future recov-

eries provides that the insurer shall receive 20 percent of all recoveries on the claims set forth in the proofs of loss until it is repaid $150,000 and that all recovery litigation shall remain in the hands of the Receiver. The movants contend that, under Section 5 of the bond, if the total loss exceeds the insurer's liability, 100 percent of future recoveries inure to the insured until the excess loss is recoverd by the insured. The movants thus reason that the Receiver's agreement with Fireman's Fund was imprudent. The court has no quarrel with movants' construction of Section 5 of the bond, but the question of prudence is not that easily resolved. There is considerable doubt that any excess loss actually exists. The court has herein previously discussed the probability that many of the claims set forth in the proofs of loss are not within the coverage of the bond. More important, the agreement between the Receiver and Fireman's Fund allows the Receiver to retain control of all recovery litigation. There are many suits presently pending against the persons named in the proofs of loss, and it is in the best interest of AL&T to have its claims against these individuals reduced to judgment as soon as possible. The court simply cannot conclude that the agreement as to the division of future recoveries was unwise.

The court, after a careful and thorough evaluation of all pertinent considerations, is convinced that the possibility of successful litigation of claims against Fireman's Fund in excess of $150,000 is exceedingly doubtful. In addition, such litigation would be expensive and result in delays the Receiver can ill afford in view of other substantial claims which must be pursued in an effort to protect the creditors as far as justified under the law and the orders of the court without the expenditure of large sums of money in litigation. Some of the claims are against the officers and directors of the insolvent corporations. Accordingly, the court finds the settlement negotiated by the Receiver to be prudent and in the best interest of the creditors and depositors of said corporations.

The court is of the opinion that the motion of movants, filed January 29, 1969, to set aside the order of the court of January 28, 1969, authorizing the Receiver to settle the claim against Fireman's Fund Insurance Company should be denied.

Judgment in accordance with the above is being entered today.